# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-SA-00089-COA

REBECCA FINLEY                                                          APPELLANT

v.

PUBLIC EMPLOYEES' RETIREMENT                                            APPELLEE
SYSTEM OF MISSISSIPPI

DATE OF JUDGMENT:              12/31/2020
TRIAL JUDGE:                  HON. ISADORE W. PATRICK JR.
COURT FROM WHICH APPEALED:    HINDS COUNTY CIRCUIT COURT,
                              FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:       GEORGE S. LUTER
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: CLAUDE PATRICK ROBERTS
NATURE OF THE CASE:           CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                  REVERSED AND REMANDED - 05/10/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McCARTY AND SMITH, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Rebecca Finley, registar at Delta State University (DSU), applied for non-duty-related

disability retirement benefits from the Public Employees' Retirement System of Mississippi

(PERS).  The PERS Medical Board denied Finley's application.  Finley appealed to the

PERS Disability Appeals Committee (Committee), which recommended Finley's application

be denied.  The Committee found Finley failed to provide objective medical evidence that

she was unable to perform her usual duties as registrar.  The PERS Board of Trustees

adopted the Committee's recommendation.  Finley then appealed to the Hinds County

Circuit Court, which affirmed the PERS decision.  Finley now appeals from the circuit

court's judgment.

¶2.    We find the PERS decision was arbitrary and capricious. The Committee improperly chose to rely on (1) a PERS standardized form filled out by Charles McAdams, Finley's supervisor and DSU's vice president of academic affairs, in which he stated her job was "sedentary," and (2) a job activities checklist that categorized her job duties as sedentary to light. PERS considered McAdams's form as the "official statement" about Finley's job duties instead of also considering a two-page letter by Finley's former co-worker and successor Emily Dabney, which described in detail the physical and mental demands of the job. Further, the Committee chose to ignore parts of McAdams's form that stated Finley's disability impaired her ability to perform specific job duties. Additionally, the Committee improperly found that any extra hours Finley worked were unnecessary and would not change the job requirements because Finley could delegate work to subordinate staff; yet, the record is silent as to whether there was any subordinate staff in her department at the time. Accordingly, we reverse and remand this case for PERS to determine if Finley can perform the duties of registrar as more definitively described by her successor, Dabney, as well as McAdams.

## FACTS AND PROCEDURAL HISTORY

¶3.    Finley was employed at DSU starting in June 1990, and after several years she was promoted to the position of registrar. Her last full day of service work was October 9, 2017. Finley is in her late fifties and has approximately twenty-eight years of PERS membership

2

service credit. Finley had been experiencing chronic pain in her back, hips, and legs that caused sleep deprivation, so her general practitioner in Cleveland, Mississippi, Dr. Charles Brock, put her on medical leave from October 2017 through December 2017. Finley retired from her position and began receiving PERS retirement benefits on February 1, 2018.

¶4. On February 7, 2018, Finley applied for non-duty-related disability retirement benefits. On her PERS Medical Information Form 4, she stated her disability was based on a diagnosis in December 2017 of "ankylosing spondylitis arthritis."[1] She reported that she quit working because she experienced "severe left shoulder, neck, back pain radiating to groin and left leg/foot, pain and muscle weakness in left arm/hand; blurred vision; [and] side effects of sleep deprivation. The responsibilities of [her] position at work required sitting for extended periods of time working at [her] computer. Repetitive motion from [using a] keyboard and mouse caused pain in [her] arms and hands." Moreover, Finley described her position as highly stressful, demanding accuracy. She claimed because of "debilitating chronic fatigue . . . [t]he physical demands of a full-time job became overwhelming."

¶5. In February 2018, Dr. Brock completed a PERS Statement of Examining Physician Form 7, stating Finley's primary diagnosis was ankylosing spondylitis described as severe.

---

[1] "Ankylosing spondylitis is an inflammatory disease that, over time, can cause some of the small bones in the spine to fuse. This fusing makes the spine less flexible and can result in a hunched over posture . . . neck pain and fatigue are common." Mayo Clinic, Patient Care & Health Information, Diseases and Conditions, https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808 (last visited May 10, 2022).

As far as her prognosis, he stated it was a "deteriorating disease." Impairments included limited mobility in moving and numbness in the hands and legs. He reported she was not at maximum medical improvement (MMI) but was permanently disabled. Her permanent partial impairments were muscle loss in the thoracic/lower spine and one shoulder. He concluded Finley was unable to perform any work. Attached were records indicating she had been prescribed approximately twenty medications over the last year. Her other "problems" included cervical disc disorder and obesity, both with an onset in 2017.

¶6. Additionally, attached to Dr. Brock's form were Finley's October 2017 Bolivar Medical Center MRI results of her cervical and lumbar spine, which he had ordered. The results of the imaging showed her lumbar spine had "very mild degenerative disease." Her cervical spine MRI showed "[m]ultilevel cervical degenerative disc disease with mild . . . central canal stenosis" and some "[p]rominent . . . facet osteoarthritis." Dr. Brock referred Finley to Dr. Philip Azordegan, a neurosurgeon with NewSouth NeuroSpine in Flowood, Mississippi, for her spinal issues.

¶7. Dr. Azordegan did not complete a PERS Form 7 but instead submitted to PERS a letter and a medical report from November 2017 after he examined her. He reviewed the MRIs of Finley's lumbar and cervical spine as well. He agreed that there was mild degenerative disease in parts of her lumbar spine. In her cervical spine, he found that "for the most part your spinal cord has room"; however, there were "some borderline areas." Additionally, he ordered MRIs of her brain and thoracic spine. Finley's brain scan came

4

back normal, but Dr. Azordegan found a "badly degenerative disc" in her thoracic spine causing irritation to the bone. While he concluded that Finley's symptoms were "not really classic for anything," to relieve her back pain he recommended therapy and injections, not surgery. He referred Finley to Dr. Rahul Vohra, a physical medicine specialist at NewSouth NeuroSpine.

¶8.    Dr. Vohra examined Finley in December 2017. He noted her complaints were multiple and ongoing. She had periscapular and thoracic pain, grip weakness, hand numbness, and diffuse joint pain that had been present for many years. He performed a nerve conduction study, which was normal. Her blood tests, however, showed elevated inflammatory markers. He thought she would benefit from physical therapy on her shoulder and thoracic spine. Dr. Vohra completed a PERS Form 7 reporting her primary diagnosis as seronegative spondyloarthropathy[2] with a secondary diagnosis of peripheral arthritis. He described both conditions as severe; however, he noted that with ongoing treatment, she had a good prognosis. At the same time, he marked that she was at MMI. Dr. Vohra assigned an impairment of two percent to her body as a whole for her spine and gave Finley a sedentary restriction. However, he deferred any employment restrictions due to her

---

[2] Seronegative spondyloarthropathy is the name for a family of rheumatological disorders (inflammation) that includes ankylosing spondylitis. National Library of Medicine, National Center for Biotechnology Information, https://pubmed.ncbi.nlm.nih.gov/29083692/#:~:text=Seronegative%20spondyloarthropat hies%20(SpA)%20are%20a,(formerly%20Reiter%20syndrome%3B%20ReA) (last visited May 10, 2022).

autoimmune disorder to her rheumatologist, to whom she was referred.

¶9.     Finley began seeing Dr. Robert McMurry, a rheumatologist in Madison, Mississippi, in December 2017.  He performed blood tests and ordered x-rays of her spine.[3]  The blood tests showed some inflammation was present, and the x-rays suggested ankylosing spondylitis.  Dr. McMurry completed a PERS Form 7 in February 2018, also giving Finley a primary diagnosis of seronegative spondyloarthropathy, with no secondary diagnosis.[4]  He described her condition as moderate to severe, with a fair prognosis that "may improve with treatment."  He noted she had not reached MMI.  His only restriction was no "prolonged sitting and standing."  Finley continued to see Dr. McMurry every few months for follow-up treatments.  He placed her on numerous medications for pain and Humira injections to reduce inflammation.  In October 2018, while her upper-body pain was worse, her lower-back pain had improved, and "her labs looked great."

¶10.    Dr. Elizabeth Mitchell, an ophthalmologist, completed a PERS Form 7, giving Finley a primary diagnosis of chronic dry eye that Dr. Mitchell described as moderate.  She also noted severe amblyopia (lazy eye) in one eye but noted it was from childhood and unrelated

---

[3] The cervical spine x-rays showed moderately severe disc degeneration and narrowing consistent with degenerative disc disease.  The x-rays of her lumbar spine showed mild degeneration and narrowing throughout it.  X-rays of her thoracic spine showed mild disc degeneration and narrowing.

[4] In a letter dated February 2018, Dr. McMurry's clinic wrote to Finley's disability insurance carrier, attaching her medical records and explaining that the clinic "believe[s] [Finley] may have seronegative spondyloarthropathy," but professionals there had only seen the patient once at that time.

to Finley's inflammatory disease. Dr. Mitchell assigned Finley no work restrictions regarding her eye conditions.

¶11. At the request of PERS, Dr. Philip Blount, a physical medicine and rehabilitation physician, conducted an independent medical exam on Finley in April 2018. He reviewed her medical records and, according to Finley, spent less than twenty minutes examining her. In his report, Dr. Blount noted Finley's medical history referenced ankylosing spondylitis, sleep apnea, and depression, among other ailments. He described ankylosing spondylitis as "a chronic progressive rheumatic disorder involving inflammation of the spine, sacroiliac joints, and peripheral joints." He noted that individuals may also have eye inflammation. Dr. Blount stated that Finley did not have severe spine or sacroiliac joint involvement, a genetic marker, or any eye restrictions. He noted that the MRI reports of her cervical, thoracic, and lumbar spine, as well as her pelvis, did "not describe any significant ankylosing features"; however, she did have evidence of elevated inflammatory markers on numerous blood tests. Dr. Blount explained that Finley felt she was unable to work due to her sleep difficulties and moderate wide-spread pain. Dr. Blount concluded that Finley did have "probable seronegative spondylorthropy" based upon her long history of spinal pain, elevated inflammatory markers, and peripheral arthritis of the lower extremities. However, he stated her issues of chronic fatigue, chronic pain, and seronegative spondylorthropathy "are compatible with work provided appropriate accommodations are made . . . . Tolerance would be the only limiting factor." On the PERS Job Activities Checklist Form 3, her job

7

duties were categorized as sedentary to light, and the form revealed that Finley could safely perform the activities with no medical risks.[5]

¶12. Dr. James Hubbard, an independent medical examiner (IME) for Finley's long-term disability insurance carrier, reviewed her medical records and spent two and one-half hours examining her in July 2018.[6] In his report, he listed numerous diagnoses, including seronegative ankylosing spondylitis, insomnia, depression, and amblyopia in her right eye.[7] Dr. Hubbard found the "spine pain from her ankylosing spondylitis . . . her most limiting factor," limiting her standing, walking, sitting and requiring her to change positions or lie down for pain relief. He reported her pain as mostly moderate to sometimes severe, her fatigue as mild to moderate, and her cognitive function likely mildly impaired enough to restrict her ability to multitask or concentrate and solve complicated problems. He stated her "insomnia diagnosis affects her overall alertness and causes fatigue. She cannot handle multitasking or be expected to do work that would require precise execution or precise computer input." He declared Finley could work part-time up to four hours a day, five days a week, but would miss one day of work a week on average due to "flare-ups of pain, stiffness, and fatigue due to her ankylosing spondylitis." Her absences would be

---

[5] Lisa Giger, DSU's human resource director, certified this form.

[6] In July 2018, Finley was approved for long-term disability insurance benefits of $2,775 per month in addition to her PERS service retirement benefits for her twenty-eight years of service credit. Finley was also approved for social security disability benefits.

[7] Dr. Hubbard found that "[t]he remainder of her diagnoses . . . caused no current impairment or physical limitation."

"unpredictable and random." Further, she "must be able to lie down for up to ten minutes as needed for her pain."

¶13. In July 2018, Finley first saw Dr. Luther Oakes, a pain physician, upon referral from Dr. Brock for neck and lower back pain. She also saw Dr. Oakes in August and October 2018. His assessment found Finley had lumbago, lumbar facet syndrome, lumbar radiculopathy, central pain syndrome, and fibromyalgia, as well as morbid obesity and ankylosing lumbar spondylitis. Finley was prescribed pain medication and counseled about the benefits of diet and exercise for chronic pain management.

¶14. Vice President McAdams stated on a PERS Employer's Certification of Job Requirements Form 2 that Finley could not perform her job, and "[d]ue to restrictions identified by her physician, she is unable to return to work." Specifically, Finley was "unable to supervise employees and provide leadership in [the]office" and was "unable to assist students." She had fifty-three days of absences in the past twelve months due to her "alleged disability."[8] On the form, McAdams claimed that up to seven hours of Finley's days were spent sitting.

¶15. In June 2018, the PERS Medical Board denied Finley's disability claim, finding insufficient objective medical evidence to support her claim. Finely appealed, and in November 2018, the PERS Appeals Committee conducted a de novo hearing. Finley testified that she began working at DSU in 1990, obtaining a bachelor's and master's degree

---

[8] This language is from the printed portion of the form.

from DSU while working in admissions, and she later transferred to the registrar's office. Eventually, she was promoted to the position of registrar. Finley testified that as manager of a department, her absences caused "hard feelings" within the department, and she never knew when she would be absent. From May 2016 through May 2017, Finley estimated she missed four to five weeks of work due to illness.

¶16. Finley testified that starting in 2004 she began having neck and shoulder pain and chronic fatigue. An MRI taken at that time showed some cervical disc degeneration. Working at a computer all day, Finley testified she would experience neck pain as well as chronic fatigue and insomnia, which led her to Dr. Brock, who put her on medical leave in October 2017 until December 2017 after an MRI showed spinal degeneration. Finley testified she was not ready to retire: "the only reason that I would want to retire is if I knew I could not be effective as a registrar."

¶17. Additionally, during the hearing, an October 2018 letter from Dabney (Finley's successor as registrar) to Finley's attorney was entered into the record.[9] Finley testified that McAdams requested Dabney write the letter describing the registrar's numerous duties.[10] Dabney described the job as "very demanding mentally and physically" with a "high stress

---

[9] The Committee states Dabney's letter describes Dabney's job activities during Dabney's first year as registrar after having transferred from another department.

[10] Dabney explained that the registrar's office manages all academic records. The registrar "is ultimately responsible for ensuring the integrity, accuracy and security of all students' academic records . . . as well as transfer academic credits. . . ." She listed numerous other duties the registrar is responsible for as well.

level." She consistently works long hours (forty-five to seventy hours a week and seventy to eighty hours a week leading up to and following graduation commencement). During her job, Dabney stated that she routinely walked a great deal (4,500 to 6,000 steps a day) to other offices and across the campus to meetings. Dabney thought the job was challenging for even a healthy individual. Additionally, before Dabney became registrar, when Finley was absent, Finley's responsibilities "[ground] to a halt." Further, Dabney noted that when Finley was in the office she "often looked fatigued" and in pain, mentioned severe insomnia and eye strain, and had "trouble concentrating and communicating effectively." Dabney concluded that "[Finley's] symptoms seemed to impair her ability to perform her responsibilities of this position."

¶18. Finley testified that McAdams was not familiar with her day-to-day job duties and disagreed with some of the comments on his Form 2 about her job description, such as that up to seven hours of her workday consisted of sitting. Finley testified that she had to walk on campus to do her job. Also, Finley agreed with Dabney's comment that the registrar typically works long hours. She testified there was much more to the job than McAdams described. Further, Finley did not have an associate registrar because the position was cut due to budgeting constraints. Finley testified that Dabney would not accept the position as registrar unless the associate registrar position was reinstated. Finley testified her illness caused her to miss deadlines and be an ineffective registrar.

¶19. After the hearing, in a seventeen-page opinion, the Committee recommended a denial

of Finley's application for disability benefits. The Committee found insufficient objective medical evidence that Finley was permanently unable to perform the usual duties of registrar at DSU. The Committee discussed the discrepancy between the job descriptions on McAdams's Form 2, Giger's Form 3, and Dabney's letter, stating, "There is no evidence that Dr. McAdams or Ms. Giger were aware of, agreed with, or approved the statements made in the Dabney letter." Further, the Committee noted there was no evidence that either individual desired to modify or withdraw his or her certification or checklist. "We are confident that if DSU required its Registrar to consistently work substantial overtime hours, Dr. McAdams and Ms. Giger would have . . . mentioned that requirement prominently" in their respective PERS forms. The Committee stated that a "supervisory employee choosing to work extra hours that could have been performed by subordinate staff does not change the job requirements" of the employer. The Committee concluded that while it "gave thoughtful consideration" to Dabney's letter, it found the PERS Forms 2 and 3 were the official statements of DSU describing the usual job requirements and activities of the registrar.

¶20. Regarding Finley's medical history, the Committee noted there was little medical evidence documenting illness prior to 2017. Dr. Brock diagnosed Finley with ankylosing spondylitis, the inflammatory disease causing much of her pain and fatigue; however, the Committee noted this was an initial diagnosis and make without the benefit of subsequent tests by Dr. Vohra and Dr. McMurray, who both diagnosed her with seronegative

12

spondyloarthropathy. The Committee stated "[b]oth conditions are associated with inflammation and can cause pain, tenderness, and fatigue"; however, "[a]nkylosing spondylitis can result in fused vertebra which cause a hunched over posture." The Committee noted that Dr. Blount found no common markers for ankylosing spondylitis and no evidence of spinal fusion.

¶21. The Committee found her rheumatologist, Dr. McMurry, was the most appropriate specialist to assess and treat her inflammatory disease. He found she was not at MMI and her prognosis was fair and may improve with treatment. The only restriction he assigned was no prolonged standing or sitting. In October 2018, he found she was improving in some areas.

¶22. The Committee found Dr. Vohra was the most appropriate specialist to assess her degenerative neck, shoulders, and back. He found her prognosis good with a permanent partial impairment of the whole person of only two percent for her spine. The Committee also noted Dr. Blount concluded Finley could return to work provided appropriate accommodations were made, and Dr. Mitchell found Finley's eye condition unrelated to her inflammatory disease. The Committee stated there had been no recent diagnosis of chronic fatigue syndrome, and Finley's fatigue was likely due to her inflammatory disease, which Humira injections were improving according to her rheumatology lab results. Additionally, the Committee opined that Dr. Hubbard's disability determination was made in part on Finley's description of her job during the examination and the contractual language of the

13

insurance policy, which was not offered into evidence. In his report, Dr. Hubbard did not refer to the PERS Forms 2 and 3 job description and checklist.

¶23. The Committee noted that the Form 2 job requirements stated Finley could move from sitting to standing as needed and vice versa. She could participate via teleconference for certain meetings, take breaks as needed, and allow subordinate staff to perform certain duties. The Committee found she was not at MMI on the date of her termination in January 2018 but was in the beginning stages of treatment for her inflammatory disease, and she was improving under her rheumatologist and pain physician's treatment.

¶24. The PERS Board of Trustees adopted the Committee's recommendation and denied Finley's application. Finley appealed again, and the Hinds County Circuit Court for the First Judicial District affirmed the Board's order. Finley now appeals from the circuit court's judgment.

## STANDARD OF REVIEW

¶25. We recognize that in reviewing the decision of an administrative agency, its "conclusions must remain undisturbed unless the agency's order: 1) is not supported by substantial evidence, 2) is arbitrary or capricious, 3) is beyond the scope or power granted to the agency, or 4) violates one's constitutional rights." *Lang v. Pub. Emps.' Ret. Sys. of Miss.*, 284 So. 3d 814, 818 (¶11) (Miss. Ct. App. 2019) (quoting *Pub. Emps.' Ret. Sys. v. Walker*, 126 So. 3d 892, 894-95 (¶5) (Miss. 2013)). "Substantial evidence" has been defined by this Court as "such relevant evidence as reasonable minds might accept as

14

adequate to support a conclusion"—"something more than a mere scintilla or suspicion."

*Id.* (quoting *Davidson v. Pub. Emps.' Ret. Sys. of Miss.*, 219 So. 3d 577, 581 (¶15) (Miss.

Ct. App. 2017); *Knight v. Pub. Emps.' Ret. Sys.*, 108 So. 3d 912, 915 (¶13) (Miss. 2012)).

"The issue before this Court is not whether there was evidence in support of . . . disability,

but whether there was substantial evidence to support the finding of PERS." *Id.* (quoting

*Doyle v. Pub. Emps.' Ret. Sys.*, 808 So. 2d 902, 905 (¶8) (Miss. 2002)). On appeal, "this

Court may neither substitute its own judgment for that of the agency which rendered the

decision nor reweigh the facts of the case." *Id.* at (¶12) (quoting *Walker*, 126 So. 3d at 895

(¶5)). "A rebuttable presumption exists in favor of PERS's decision, and the claimant has

the burden of proving the contrary." *Id.* (quoting *Davidson*, 219 So. 3d at 581 (¶15)).

**ANALYSIS**

¶26.    Finley argues the PERS decision to deny benefits was not supported by substantial

evidence and was arbitrary and capricious for the following reasons: (1) PERS did not

consider McAdams's certification and Dabney's letter regarding Finley's inability to

perform her job; (2) PERS did not consider the cumulative effect of Finley's numerous

medical problems on her ability to perform her job; (3) PERS agreed that Finley's physicians

that she was not at MMI and should continue pain management for chronic pain; and (4) all

of Finley's physicians reported she could not perform her job, including her disability

carrier's IME, the PERS IME, Dr. Blount's statement that tolerance would be a factor; and

the Social Security Administration's finding that she was disabled. We find Finley's first

argument dispositive—PERS appears to have ignored Dabney's letter in favor of parts of McAdams's statement regarding the ability of Finley to perform her job. Accordingly, we reverse and remand.

¶27. Finley sought "regular disability benefits," which covers "employees with the requisite . . . amount of creditable service who become disabled for any reason."[11] *Walker*, 126 So. 3d at 895 (¶6) (citing *Pub. Emps.' Ret. Sys. v. Dishmon*, 797 So. 2d 888, 891-92 (¶¶10-11) (Miss. 2001); Miss. Code Ann. § 25-11-113(1)(a) (Rev. 2010)). Finley had the burden of proving she was permanently disabled as defined by statute: "[t]he inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation . . . ." Miss. Code Ann. § 25-11-113(1)(a).

¶28. Finley argues that PERS arbitrarily and capriciously considered the evidence regarding her ability to perform her job as registrar, relying only on McAdams's "Employer's Certification of Job Requirements" (Form 2) and Giger's "Job Activities Checklist" (Form 3), while ignoring Dabney's uncontradicted, detailed letter of her job description and Finley's own testimony. We agree and reverse based upon this issue.

---

[11] "[A]ny active member in state service who became a member of the system before July 1, 2007, and who has at least four (4) years of membership service credit . . . may be retired by the board of trustees . . . provided that the medical board, after an evaluation of medical evidence that may or may not include an actual physical examination by the medical board, certifies that the member is mentally or physically incapacitated for the further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired. . . ." Miss. Code Ann. § 25-11-113(1)(a) (Rev. 2018).

16

¶29.   In its opinion, the Committee acknowledged the discrepancy between the job descriptions on McAdams's Form 2, Giger's Form 3, and Dabney's October 2018 letter, but the Committee appeared to ignore certain facts in Dabney's letter[12] and McAdams's form. The Committee found McAdams's form to be "the official statement" of Finley's position even though it offered no details on the reality of Finley's working day.   Even so, McAdams's form stated that although Finley's job was "sedentary," Finley could not perform her job, was unable to supervise employees, and could not provide leadership in the office.   Further, regarding "accommodations offered," McAdams stated that "due to restrictions identified by her physician, she is unable to return to work."   PERS arbitrarily and capriciously ignored these latter statements while choosing to focus on McAdams's unsupported assertion that Finley spent "the majority of the day sitting, up to seven hours per day."

¶30.   At the hearing, Finley testified that while she may sit at a desk looking at a computer for seven hours, that was not all her job entailed—she would be in the office for much longer than an eight-hour day.   Finley agreed with Dabney's statement that the registrar consistently worked long hours, such as forty-five to seventy hours a week most weeks. Finley explained that reviewing degree audits and other intensive work had to be done uninterrupted, which would mean after regular business hours.   Dabney stated the job was

---

[12] The Committee stated it gave "thoughtful consideration" to Dabney's letter, but this does not appear to be the case.

"an executive position in a small university." Dabney described the job as demanding mentally and physically: "it is challenging for a generally healthy person to perform the duties and deal with the high stress level and volume of work." Dabney wrote that the job could demand seventy to eighty-five hours a week during graduation commencement, with additional walking across the campus. Giger's form, however, stated there were minimal physical requirements for the job, with only "occasional (6 to 33%)" walking, standing, or lifting less than ten pounds. However, this form did not state who provided the information, and whether it had been updated.

¶31. McAdams's certification that Finley's job was sedentary is clearly contradicted by Dabney's and Finley's testimony. In fact, Finley testified that McAdams requested Dabney write the letter giving more details on Finley's job description because McAdams was not familiar with Finley's day-to-day duties as registrar, even though he was her superior. Moreover, there was no evidence that Finley, "a supervisory employee," merely chose to work extra hours instead of delegating work to subordinate staff, as the Committee stated. The record does not identify any such subordinate staff employed by the registrar's office during Finley's tenure. In fact, Finley clearly testified that budget cuts had eliminated the position of associate registrar when she became full registrar.[13] Yet Finley testified that Dabney would not take the position of registrar unless the associate position was reinstated

---

[13] Finley testified she was promoted from associate registrar to interim registrar and then to full registrar.

18

"because without it, the registrar had no backup."[14] Further, there is nothing in the record to contradict Finley's testimony that she worked extra hours. Moreover, there is nothing in the record to support McAdams's statement that Finley's job was sedentary. We find the Committee's reliance on McAdams's Form 2, while ignoring contradictory detailed facts about the job in Dabney's letter, is arbitrary and capricious.

¶32.    Finley cites *Newton v. Public Employees' Retirement System of Mississippi*, 301 So. 3d 74 (Miss. Ct. App. 2020), in support of her argument. In *Newton*, we reviewed a denial of disability benefits for Linda Newton, a kindergarten teacher's assistant at a public school. *Id.* at 76 (¶¶1, 3). The issue was not Newton's diagnosis of cerebral palsy, which PERS rejected, but whether she could perform the necessary functions of her job regardless of her diagnosis. *Id.* at 82 (¶35). While PERS acknowledged Newton suffered from long-standing deficits, it claimed "the record did not support these diagnoses or debilitation. . . ." *Id.* at 83 (¶36). In contrast, the circuit court found objective evidence Newton had back problems. *Id.* Also, Newton detailed numerous physical difficulties that made her unable to perform her job. *Id.* at 84 (¶40). Further, another teacher's assistant who worked alongside Newton testified to Newton's physical difficulties performing her job and its demanding nature. *Id.* at 81-82, 84 (¶¶24-25, 40). Even so, the employer's certification form filled out by the district superintendent stated Newton could perform her job physically. *Id.* at 83 (¶¶38-39).

---

[14] The record is silent as to how many, if any, subordinates were employed in the registrar's office during Finley's tenure.

This Court concluded that PERS's continued reliance on the form was arbitrary and capricious when the assessment of Newton's job requirements had "no basis in the record." *Id.* at 76-77, 84 (¶¶5, 42).

¶33. We find *Newton* analogous to the instant case. Here, while Finley had a diagnosis of inflammatory disease that resulted in numerous physical difficulties, it was not her diagnosis but the evidence showing she could not perform her very demanding job due to her physical limitations that makes the denial of benefits here arbitrary and capricious. As in *Newton*, PERS ignored this evidence in favor of a form that stated Finley's job was sedentary, which was filled out by an individual (McAdams) who admittedly was not familiar with her daily duties, and requested a co-worker who was more familiar with the job (Dabney) write a detailed letter to Finley's attorney. Further, as in *Newton*, Dabney, who worked alongside Finley and succeeded her in the same job, stated the registrar position was more demanding than McAdams's description. As stated in *Newton*, "there is no requirement for a specific medical condition if the evidence supports the inability to continue work or disability." *Id.* at 83 (¶35) (quoting *Poole v. Pub. Emps.' Ret. Sys.*, 57 So. 3d 13, 16 (¶19) (Miss. Ct. App. 2010)). Accordingly, we reverse the circuit court's judgment affirming PERS's denial of benefits because PERS's assessment of Finley's job requirements and ability to perform her job was arbitrary and capricious. We remand the case for PERS to determine if Finley could perform the true duties of registrar with her disability and the support staff, if any, she had at the time.

¶34.   **REVERSED AND REMANDED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**